UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|                                              |   |                        |
|----------------------------------------------|---|------------------------|
| MICHAEL GASPARI,                             | ) |                        |
|                                              | ) |                        |
|                                              | ) |                        |
|                                              | ) |                        |
|       Plaintiff, | ) | Case. No. 10 C 6759    |
|     v.                    | ) |                        |
|                                              | ) | Magistrate Judge       |
| Michael J. Astrue,                           | ) | Arlander Keys          |
| Commissioner of Social                       | ) |                        |
| Security                                     | ) |                        |
|      Defendant.     | ) |                        |

## MEMORANDUM OPINION AND ORDER

### Background & Procedural History

Plaintiff, Michael Gaspari, applied for Disability Insurance Benefits and Supplemental Security Income on April 7, 2003, claiming that he became disabled as of February 8, 2003 because of diabetes, hypertension, depression, and panic attacks. That application was denied initially and on appeal; Mr. Gaspari requested and received a hearing before an Administrative Law Judge, who issued a decision denying his claim for benefits on February 13, 2006. After the Appeals Council denied review, Mr. Gaspari filed a lawsuit in this Court, seeking review of what had by then become the final agency determination on that 2003 application. See Gaspari v. Barnhart, No. 06 C 5292 (N.D. Ill. Complaint filed Sept. 28, 2006).

While that case was proceeding, Mr. Gaspari filed a second application for benefits on March 10, 2006, claiming that he became disabled as of June 12, 2005 because of diabetes, heel

fractures, depression and the residual effects of Guillain-Barre Syndrome. That application was also denied, initially and on appeal; Mr. Gaspari again requested a hearing before an Administrative Law Judge and the case was assigned to ALJ Mona Ahmed, who scheduled a hearing for October 17, 2008.

On May 7, 2008 – before ALJ Ahmed held her first hearing in Mr. Gaspari's case, this Court issued a decision in connection with the appeal of the first application, remanding Mr. Gaspari's case to the Commissioner for further proceedings. On remand, the case was reassigned to ALJ Ahmed, who, by that time, also had before her the second application for benefits. At the October 17, 2008 hearing, ALJ Ahmed gave Mr. Gaspari the option of consolidating the two applications, and he accepted. The ALJ then postponed the hearing so that she could obtain the materials from the remand of the first application. She held the hearing on April 13, 2009, and issued her decision on September 18, 2009. Like the first ALJ, ALJ Ahmed determined that Mr. Gaspari was not disabled, and she denied his claim for benefits. Mr. Gaspari appealed, and, after the appeals council denied review – making ALJ's decision the final agency decision – he filed another federal court action seeking review of that decision. *See Gaspari v. Astrue*, No. 10 C 6759 (Complaint filed Oct. 20, 2010). Although initially assigned to another judge, the case was

reassigned to this Court because of its involvement with the first case.

## Summary of Proceedings on the First Application

The first time around, after Mr. Gaspari's claim was first denied initially and on review, his case was assigned to Administrative Law Judge John Meyer, who held a hearing, heard from Mr. Gaspari, as well as several experts, then issued a decision on February 13, 2006, denying Mr. Gaspari's claim for benefits. Initially, the ALJ determined that Mr. Gaspari had engaged in substantial gainful activity during 2004 and, therefore, could not be entitled to benefits until January 1, 2005. Additionally, the ALJ determined that, although Mr. Gaspari suffered from hypertension, diabetes mellitus, degenerative joint disease, and a history of Guillain-Barre Syndrome, as well as severe OCD, he was nonetheless capable of performing a "significant range of light work," as well as sedentary work.

Mr. Gaspari challenged that decision on a number of grounds. First, he argued that the ALJ failed to confirm that the Vocational Expert's testimony was consistent with the Dictionary of Occupation Titles; the Commissioner conceded the point, and the Court agreed.

Mr. Gaspari also argued that the ALJ's hypotheticals to the VE were flawed in several respects. First, he argued that the

ALJ failed to include a limitation for unskilled work; the Court rejected this as a basis for remand, noting that, although the hypotheticals did not include an unskilled work limitation, all of the jobs identified by the VE were, in fact, unskilled jobs. Second, Mr. Gaspari argued that the ALJ failed to explain adequately the extent of his limitation for climbing stairs; the Court rejected this as well. Next, he argued that the ALJ failed to explain why he rejected some of the VE's testimony, while accepting the rest. Here, the Court agreed. The VE testified that, if Mr. Gaspari missed 1 or 2 days of work per month or required unscheduled breaks each week, he would be unemployable. This testimony was unrebutted in the record, and, if the ALJ were going to disregard it, he should have explained as much and provided his reasons for doing so. Because he did not, the Court agreed that remand was appropriate.

Mr. Gaspari also challenged the ALJ's credibility determinations. The Court determined that those determinations were largely supported in the record. But the Court did note that the ALJ seemed to have made an independent medical finding when he determined that Mr. Gaspari's diabetes was not uncontrolled, and it cautioned that, on remand, the ALJ should refrain from playing doctor.

Finally, Mr. Gaspari argued that the ALJ failed to analyze properly the medical opinions of record. The Court agreed,

noting that he failed to even mention two of the assessments in his opinion, and failed to explain why he was rejecting some in favor of others.

## Proceedings Before ALJ Ahmed

On remand, Mr. Gaspari's case was reassigned to ALJ Ahmed, who consolidated the two cases and held a hearing on both applications on April 13, 2009. At that time, the ALJ explained that she was adjudicating Mr. Gaspari's disability claim covering the period from February 8, 2003 to the date of the hearing. She then heard testimony from Mr. Gaspari, who was represented by counsel.

Mr. Gaspari testified that he lived in Midlothian with his parents, and that he had lived with them for the past 15 years. Record at 1410. He testified that he was 47 years old at the time, that he had a college degree in criminal justice, that he had no income and that he had Illinois Comprehensive Health Insurance, which his parents paid about $600 a month for. Record at 1409, 1411. Mr. Gaspari testified that he had a car and that he drove regularly – about once or twice a week. Record at 1411.

With regard to his work activities, Mr. Gaspari testified that he last worked July 7, 2007 at Illinois Security Services; he testified that he worked in that job beginning in 2003, and that he worked between 20 and 32 hours per week. Record at 1411-1412. Mr. Gaspari also testified that, in 2005 and 2006, he

worked as a part time police officer for the City of Markham; he
worked approximately 35 hours per week from about November of
2005 through February 2006.  Record at 1412-1413.  He testified
that he stopped working for Markham in February 2006 because of a
change in the organization (they eliminated part-time positions
and he got laid off), and he stopped working for Illinois
Security Services in July 2007 because he could no longer do the
job.  Record at 1414-1415.  He testified that he was having
problems with his feet, his back and his knees.  Record at 1417.
In particular, he testified that he had "a little bit of
neuropathy from the diabetes in my knees"; he also had a torn
meniscus and bone spurs.  Record at 1417.  He testified that he
had three herniated discs, which rendered him unable to pick up
his employer bank's money bags (they weighed 10 to 20 pounds).
Record at 1417.  He testified that he also had trouble going up
and down the stairs to the bank's vault, had problems sitting and
had issues - especially fatigue - associated with his medication.
Record at 1417.

The ALJ noted that the previous ALJ assigned to the case had
determined that Mr. Gaspari's work activity was "substantial
gainful activity through at least 2004" and that she was not
inclined to disagree with that.  Record at 1422-1423.  With
regard to the security work, Mr. Gaspari testified that the job
required him to sit during the early part of the business day,

6

and to do a perimeter walk every half hour – outside the bank, inside the bank, around the stairs and up the stairs to the vault. Record at 1424. He testified that it took him approximately 30 minutes to complete the walk, though the bank wanted him to do the walks faster. Record at 1423-1424.

Mr. Gaspari testified that his knees got really bad in 2006, as did his back, and he started using a cane in 2006. Record at 1424. He testified that, when he was working at the bank, he would have to stand up and lean on something to get relief before he started his perimeter walk. Record at 1424.

When asked about his daily activities, Mr. Gaspari testified that he usually starts his day between 9:30 and 10:00, he gets up, brushes his teeth, has a cup of coffee and some breakfast, gets dressed, tries to "take a brisk walk" for about a quarter of a mile, reads the paper, watches the news and then has lunch; after lunch, which is usually prepared by his mother, he usually walks the dog or takes another walk, reads and then, after taking his medication, naps between about 3 and 6. Record at 1441-1443. He testified that he typically spends his evenings watching television and reading; he testified that he usually goes to bed after the news, around 10:30. Record at 1444. He testified that he is able to do some light cleaning and dusting, he washes the dishes. Record at 1444. He testified that he is able to go out to church meetings and to some social events, maybe once or twice

a month. Record at 1446. Mr. Gaspari testified that he could stand or walk for, maybe, an hour or an hour and a half before he'd feel pain in his knees and lower back and have to lean on something or sit down. Record at 1426. He testified that he can sit for 15 to 30 minutes, that he is unable to squat and stand back up (because of his knees), that he is unable to bend over with straight legs and stand back up. Record at 1426-1427. He testified that he struggles to lift a gallon of milk off the counter. Record at 1428. He testified that he has trouble concentrating on tasks for long periods of time, that it is hard to read or spend time on the computer for longer than 15 or 30 minutes. Record at 1433-34.

At the time of the hearing, Mr. Gaspari was 5'8" and weighed 260 lbs.; he testified that he had maintained that weight (give or take a pound or two) for about 5 or 6 years. Record at 1427. Mr. Gaspari testified that he suffers from diabetes, that he has high sugars and low sugars, and that when he has low sugars, he "can't think straight"; he testified that this happens at least once or twice a week. Record at 1428. He testified that he uses "insulin pump therapy" to control his symptoms; prior to that he took up to 6 shots a day, plus oral medication. Record at 1429.

He also testified that, since February of 2009, he's had an ulcer on the lower part of his left foot between his smallest two

toes; it's the size of a dime and prevents him from being able to walk. Record at 1429-1430.

With regard to his mental status, he testified that he sees a psychiatrist for depression and anxiety; he testified that he started seeing him in 2000 and that he sees him every three months. Record at 1431. He testified that he goes into these "depression moods where I get on crying spells, and I get really down." Record at 1431. He testified that this happens "at least one or twice a week"; sometimes more, sometimes less. Record at 1431. He testified that he takes a number of medications prescribed by his psychiatrist, and that they make him drowsy, sleepy and lethargic, and leave him unable to function. Record at 1439. In addition to the crying spells, he testified that he gets panic attacks when he has to be around a lot of people. Record at 1434.

Next, the ALJ heard from Dr. Ashok Jilhewar, who testified as a medical expert with regard to Mr. Gaspari's physical conditions; Dr. Jilhewar was present at the hearing, heard Mr. Gaspari's testimony and reviewed the medical exhibits in his file. Record at 1455. According to Dr. Jilhewar, Mr. Gaspari was moderately obese (at 5'7" and 267 lbs.) and suffered from heel fractures, apparently resolved, chronic low back pain, bilateral degenerative disease of the knees, left more severe than right, and diabetes mellitus. Record at 1456-1459. The ME

noted that Mr. Gaspari's treating endocrinologist characterized his diabetes as "badly controlled," even with the use of an insulin pump. Record at 1460. The ME testified that, based upon his review of the documentation, Mr. Gaspari would be limited to sedentary work, that he could sit indefinitely, stand for half an hour at a time and up to 2 hours in an 8-hour day, that he could never kneel, crawl or crouch; that he could stoop only occasionally, that he is restricted in terms of climbing ladders and ropes, using mechanical hazards and moving machinery; that he could climb stairs occasionally; that he would be able to lift and carry, at most 10 lbs., though there was some testimony that even 1 to 2 lbs. was too much for him to lift. Record at 1470-1472. The ME also noted that Mr. Gaspari could have additional restrictions because of his pain. Record at 1472. He also testified that it was too soon to tell whether the ulcer on Mr. Gaspari's foot would amount to an impairment. Record at 1476.

Next, the ALJ heard from Dr. David Biscardi, who testified as a medical expert with respect to Mr. Gaspari's mental impairments. Dr. Biscardi noted that Mr. Gaspari had been diagnosed with general anxiety disorder, and, although he was a bit troubled by the lack of a mental status exam (the last exam was in 2006), he noted that Mr. Gaspari would be capable of simple, routine, competitive work, would be mildly limited in his activities of daily living, mildly to moderately limited in

social functioning, and mildly to moderately limited in concentration, persistence or pace, with no evidence of deterioration and functioning. Record at 1483-1484. He also testified that, because of his anxiety, Mr. Gaspari would be prohibited from working closely with the public. Record at 1485. He testified that his opinion was limited to September 2007, and that, after that time, he really did not have sufficient information to form an opinion as to Mr. Gaspari's level of functioning or restrictions. Record at 1483-1484. He noted that he did not believe there had been any significant improvement, that the records "would suggest that there may . . . in fact, have been a decline, but that cannot be objectively found by the evidence that we have." Record at 1484. Dr. Biscardi recommended that the ALJ order a supplemental exam, specifically a full mental status examination. Record at 1484. In response to a comment from the ALJ that she found the case to be confusing, Dr. Biscardi noted that part of the problem with the record was that "we have various opinions, and we have very little in the way of objective findings." Record at 1486.

Finally, the ALJ heard from Lee Knutson, who testified as a Vocational Expert. The VE testified that Mr. Gaspari's past work would be characterized as follows: the security guard job would be considered light and semi-skilled, with an SVP of 3; his clerk/typist job with the Secretary of State would be considered

sedentary and semi-skilled, with an SVP of 4; his investigator job with the private security company would be considered light and skilled, with an SVP of 5; his police officer and campus police officer jobs would be considered medium and skilled, with an SVP of 6; and his job as an elementary school teacher would be considered light and skilled, with an SVP of 7. Record at 1489.

The ALJ then asked the VE a series of hypothetical questions about a hypothetical person's ability to work. First, the ALJ asked the VE about a hypothetical person with the same age, education and work experience as Mr. Gaspari, who: was limited to sedentary work; could lift a maximum of 10 lbs. and lift lighter objects occasionally; could stand and walk for no more than 30 minutes at a time, for a maximum combined total of 2 hours in an 8-hour day; could sit without limitation or restriction; could not climb ladders, ropes and scaffolds, work at heights or around hazards such as dangerous machinery, or kneel, crouch or crawl; could occasionally climb stairs and ramps, stoop and balance; was limited to simple and repetitive types of tasks; and could not perform work involving dealing with the public. The VE testified that such a person would not be able to perform any of Mr. Gaspari's past work. Record at 1490-1491. The VE testified, however, that such a person would be able to do other jobs that existed in significant numbers within the Chicago metropolitan area, including that of bench assembler, inspector,

checker/weigher, hand packager, and hand packer. Record at 1492. The VE testified that, even with the restrictions noted, the person described would be able to perform these jobs consistent with the way they are described in the Dictionary of Occupational Titles. Record at 1492.

The ALJ then asked the VE about a hypothetical person with the same restrictions and limitations, but who also needed an option to alternate from sitting into a standing position once an hour for a few minutes. The VE testified that, if the person could exercise this option and still remain on task in the work area, his conclusion would remain unaffected; he testified, however, that if the person had to leave the work area or stop working, he would essentially be unemployable. Record at 1492. The VE testified that the jobs he identified were all "production related" jobs, so if the person had to get up and walk around even for a minute each hour, it would be problematic; he testified that if the person had to exercise the option once an hour, it might not be a significant factor – might reduce the universe of potential jobs by about 30% – but if the person actually had to leave the area, all of the jobs would be ruled out. Record at 1493. The VE testified that, if the person could limit these walking breaks to once every two hours, he would be able to work "because there are breaks every two hours." Record at 1494.

In response to further questioning by the ALJ, the VE testified that, if the person's maximum lifting ability were 5 lbs., instead of 10 lbs., it may reduce the universe of potential jobs by 10%. Record at 1494. The VE also testified that, if he person required frequent bathroom breaks, beyond what is typically permissible, it might impact his ability to work; he also testified that such bathroom breaks could be necessary for someone whose diabetes was uncontrolled. Record at 1496-1497. Additionally, he testified that these unskilled sedentary jobs had very little tolerance for absences; he testified that if the person were absent 10% of the time or more, or if he missed two or more says a month on a regular basis, he would lose his job. Record at 1497.

On questioning from Mr. Gaspari's attorney, the VE testified that, if a person with the characteristics and limitations described by the ALJ also had a complete prohibition on bending or stooping, he would be unemployable. Record at 1500, 1502. He also testified that, to maintain the production type jobs he identified, a person would have to be on task 85 to 90% of the time, and that, if he couldn't focus on the job at least 85% of the time during work periods, he would be unemployable. Record at 1503.

In addition to the testimony of Mr. Gaspari and the medical and vocational experts, the ALJ also had before her an extensive

array of medical records.[1]  The Court detailed extensively the
earlier medical records in its last decision, and it will not
repeat that summary here.  But in addition to those records, the
administrative record includes a number of medical records
dealing with pain management.  Initially, the record shows that,
on March 26, 2007, Mr. Gaspari went to the Pain Medicine Center
to have a lumbar epidural steroid injection.  Record at 1064.  He
returned on April 20, 2007; at that time, he reported that he had
a lumbar epidural steroid injection on March 26, 2007 for a
herniated disk at L5-S1 and L4-5, and was doing well until April
11, 2007, when he was rear-ended in a car accident.  Record at
1030.  He complained of pain at an 8.5 out of 10, but, on
examination, his cervical spine was normal and non-tender, his
facet joints, SI joints, and hip joints were all pain free,
straight leg raising test was negative, his gluteus and
piriformis muscles were non-tender.  Record at 1030.  He was
diagnosed with degenerative disk disease L4-5, L5-S1 and
chondromalacia patellae with osteoarthritis of the knee joint,
and told to continue his pain medications and make an appointment
for another steroid injection.  Record at 1030.

On May 7, 2007, Mr. Gaspari went back to the Pain Medicine
Center for another lumbar epidural steroid injection; he

_____

[1]The Court detailed the earlier medical records in its January
10, 2008 decision and familiarity with that discussion is
assumed.  Here, the Court will focus on the records that post-
date the first ALJ's decision.

"tolerated the procedural well." Record at 1026. He returned again on August 13, 2007, for another lumbar epidural steroid injection, and he again tolerated the procedure well. Record at 1024. According to the clinic notes, post-operatively, he was ambulating independently and moving all four extremities. Record at 1024.

He returned to the Pain Medicine Center on October 19, 2007, complaining of lower back pain. Record at 1017. The clinic notes show that, on physical exam, Mr. Gaspari showed "full range of motion of the cervical spine"; "no paraspinal cervical or lumbar tenderness"; bilateral upper extremity strength of 5/5; limited flexion to 80 degrees in the lumbar spine but otherwise full range of motion of the lumbar spine; his straight leg raise tests were negative bilaterally. Record at 1018. The records note that Mr. Gaspari reported having an injection on August 13, 2007, with minimal relief; they also show that Mr. Gaspari reported having had two previous injections, both of which "worked very well for him." Record at 1017. He reported that, with the injection on August 13, 2007, he "experienced a lot of pain right after the procedure was done up to 4 to 5 days, and he had no pain relief, unfortunately, after the procedure." Record at 1017. Mr. Gaspari reported that his pain at the time of the visit on October 19 was at a 6 or 7 out of 10, and he complained of trouble walking on the treadmill, stiffness upon awakening,

frequent popping/clicking in the L4-5 region, numbness and
tingling in the bilateral lower extremities.   Record at 1017.
Finally, the records show that, on that date, Mr. Gaspari and the
treating physician discussed other pain management options, but
he decided to stick with what he was doing; the records also show
that they discussed the possibility of seeing a surgeon to deal
with weakness in his lower extremities, and Mr. Gaspari decided
to "hold off on that at this point."   Record at 1018.   There is
no indication that he ever pursued a surgical consult.

Mr. Gaspari returned to the Pain Medicine Center on May 23,
2008 for followup care.   Record at 1055.   At that time, Mr.
Gaspari reported that "he had a lumbar epidural steroid injection
in August of 2007, and he had a good bit of relief after the
injection."   Record at 1055.   He reported, however, that in
March/April of 2008, "he started to have low back pain as well as
shooting pain down his left lower extremity that usually happens
with activity"; he also reported that his knee pain had been
"getting worse" and he was having "a lot of tightness around his
right knee joint as well as feelings of pulling for the past few
days."   Record at 1055.   He reported that he had been doing "a
lot of weightlifting with a personal trainer at his local health
club, and that he has been trying to lose weight although has
been unsuccessful."   Record at 1055. He rated his pain at a 6 to
8 out of 10.   Record at 1055.   On physical examination, he had no

cervical or thoracic tenderness, but did have some tenderness over the lumbar spine and paravertebral muscles, as well as along the left knee joint and the right knee joint; he had pain with hip flexion and extension bilaterally, decreased range of motion in the left knee secondary to pain. Record at 1055. He was diagnosed with degenerative disc disease, herniated lumbar disc and osteoarthritis of both knees, and was given a prescription for physical therapy and one for Zanaflex to control muscle spasms at night. He was sent that same day for "bilateral lower extremity Dopplers" and a lumbar epidural spinal injection and was told to follow up with orthopedics the next week to deal with his knee pain. Record at 1056. The record shows that Mr. Gaspari had the lumbar epidural steroid injection that same day and that he "tolerated the procedural well." Record at 1057. He was told to follow up in 6 to 8 weeks. Record at 1057. It is unclear whether he did follow up, as there appear to be no further records from the Pain Medicine Center.

In addition to the pain management records, the ALJ also had before her a report from Dr. Erika Liljedahl, who performed a full psychological evaluation on Mr. Gaspari at the ALJ's request. According to the report, Dr. Liljedahl interviewed, examined and evaluated Mr. Gaspari on May 13, 2009. Record at 1352. Dr. Liljedahl noted that Mr. Gaspari was punctual, had good hygiene and made good eye contact; he walked slowly, using a

cane. Record at 1352. She noted that he had no unusual psychomotor agitation/retardation behaviors; his thinking was logical and coherent and his speech was normal. Record at 1352. Dr. Liljedahl noted that he was cooperative and had good insight, though his affect was irritable and his mood was depressed. Record at 1352. According to Dr. Liljedahl, Mr. Gaspari reported that he was seeking social security benefits because of "fatigue"; he reported that he spent his time listening to the radio, reading the paper, reading books and magazines, writing, walking down the block or going to the library; he also goes online and "googles things" for an hour or two. Record at 1352. He reported being able to cook simple meals, though he noted that his mother cooks for him. Record at 1352. He reported that his medications make him feel "dopy." Record at 1353. Dr. Liljedahl noted that Mr. Gaspari was "oriented to person, place, time and reason for appointment"; his attention and memory skills were average and adequate; his language and simple math skills were good, as were his judgment and reasoning. Record at 1354-1355. Dr. Liljedahl found Mr. Gaspari's congition to be within normal limits. Dr. Liljedahl diagnosed Mr. Gaspari with depressive disorder, not otherwise specified, and with anxiety disorder; she noted that his prognosis was "good to fair" and his motivation was "good." Record at 1355. She noted that he was mildly limited in his ability to carry out complex instructions and in

his ability to make judgments on complex work-related decisions, but she noted no other limitations. Record at 1356. She did note, however, that his levels of fatigue and pain might affect his ability to function; she noted that "if he is fatigued, his thinking will likely not be as efficient." Record at 1357.

The ALJ issued her decision on September 18, 2009, finding that Mr. Gaspari had not been under a disability within the meaning of the Social Security Act from February 8, 2003 through the date of the decision. Record at 435. Initially, the ALJ determined that Mr. Gaspari had engaged in substantial gainful activity in 2004, but that his employment did not rise to the level of substantial gainful activity in 2005, 2006, or 2007. Record at 437. She, therefore, determined that he had not engaged in substantial gainful activity since January 1, 2005. Record at 437.

Next, the ALJ determined that Mr. Gaspari had the following severe impairments: obesity, diabetes mellitus, right heel stress fracture; degenerative disc disease in the lumbar spine; degenerative arthritis in both knees; chronic venous insufficiency; hypertension; status post Guillain-Barre Syndrome; anxiety and depression. Record at 437. She determined that his impairments "more than minimally limit the claimant's ability to do basic work activities." Record at 437. But she also determined that his impairments "do not meet or equal any

relevant listing." Record at 438. In particular, the ALJ noted that she had considered listings 1.02 (major dysfunction of a joint), 1.04 (disorders of the spine), 9.08 (diabetes), and 12.04/12.06 (mental impairments), and determined that the evidence fell short of establishing impairments at those listing levels. Record at 438-439.

With respect to listing 1.02, the ALJ first noted that the listing required "a gross anatomical deformity, with specific diagnostic and clinical findings, resulting in the inability to ambulate effectively." Record at 438. She then determined that Mr. Gaspari's medical records did not "document the type of gross anatomical deformity contemplated by the listing" and that "the record does not show that the claimant is unable to ambulate effectively, as defined in the listing"; in particular, the ALJ noted, Mr. Gaspari "is able to walk and engages in activities that require effective ambulation." Record at 438.

With respect to listing 1.04, the ALJ noted that this listing is met "where there is one of the following: (1) evidence of nerve root compression, characterized by specific clinical findings; (2) spinal arachnoiditis manifested by severe burning or painful dysesthesia; or (3) spinal stenosis resulting in psueodoclaudication and resulting in an inability to ambulate effectively." Record at 438. After noting that neither (2) nor (3) applied – Mr. Gaspari does not have spinal arachnoiditis or

spinal stenosis – the ALJ determined that, "while MRI studies show disc abnormalities with some neural foraminal narrowing, examinations do not document the requisite clinical findings of nerve root compression, which include an appropriate dermatomal distribution of motor loss, sensory and reflex loss, and positive straight leg raise test."  Record at 438.

After noting that listing 9.08 requires diabetes with neuropathy causing significant and persistent disorganization or motor function, acidosis occurring on average once every two months, or retinitis proliferans, the ALJ found that, in Mr. Gaspari's case, the record "does not reflect diabetic neuropathy, acidosis or retinopathy."   Record at 438.

With regard to listings 12.04 and 12.06, the ALJ determined that Mr. Gaspari had "mild restriction" in his activities of daily living; "moderate difficulties" in social functioning; "moderate difficulties" in the areas of concentration, persistence and pace; and no "extended duration" episodes of decompensation.  Record at 439-440.  She determined, therefore, that he did not meet either listing.

The ALJ then determined that Mr. Gaspari had the residual functional capacity to perform sedentary work; she found that he was limited to simple, routine tasks and could not perform work involving dealing with the public, he could lift a maximum of 10 lbs., could stand/walk for 30 minutes at a time, for a total of

up to 2 hours in an 8-hour day, could sit at least 6 hours in an 8-hour day, could occasionally climb ramps and stairs, stoop or balance, but could not climb ladders, ropes or scaffolds, could not work at heights or around hazards, and could not kneel, crouch or crawl. Record at 440.

The ALJ noted that, "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," the regulations require an ALJ to make credibility findings based upon a consideration of the entire case record. Record at 441. The ALJ then determined that, although she was convinced that Mr. Gaspari's impairments "do limit [him] substantially, as reflected in the RFC finding for no more than sedentary exertion with multiple additional limitations," she did not find "sufficient support for additional limitations beyond those included in the RFC assessment." Record at 442. She determined that, given the "many inconsistencies between the testimony/allegations and other evidence in the overall record," Mr. Gaspari's statements concerning the intensity, persistence and limiting effects of his symptoms were "not fully credible." Record at 442.

The ALJ then discussed in detail the record evidence relating to Mr. Gaspari's various ailments - his diabetes, his orthopedic complaints, his ear/nose/throat issues, his mental

health issues, his pain management issues, and his general or primary care; she also discussed the consultative examinations and the testimony and opinions of the various experts involved in the case. Record at 442-454. She also discussed the weight, if any, to be given the various medical and expert opinions, and her reasons therefor. Record at 455-460. The ALJ also went through a litany of inconsistencies in Mr. Gaspari's testimony – inconsistencies between what he said and in what he did, as well as inconsistencies in what he said at the hearing and in what he reported to his doctors. Record at 461. Taking all of this into account, the ALJ concluded that Mr. Gaspari had impairments that limited his ability to work, but that, despite these impairments, he was capable of performing sedentary work, with the non-exertional restrictions she described. Record at 462.

The ALJ determined that, given Mr. Gaspari's RFC, his past relevant work was no longer an option. Record at 462. She determined, however, that given his age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that he could do – notably, representative occupations such as bench assembler, inspector and hand packer. Record at 462-463. Accordingly, she found him to be not disabled. Record at 464. Mr. Gaspari argues that the ALJ's decision should be reversed or remanded because the ALJ failed to evaluate properly the medical source opinions; failed

to consider Mr. Gaspari's obesity; and failed to evaluate properly Mr. Gaspari's credibility.

## DISCUSSION

Applicable Law

An individual claiming a need for DBI or SSI must prove that he has a disability under the terms of the SSA. In determining whether an individual is eligible for benefits, the social security regulations require a sequential five step analysis. First, the ALJ must determine if the claimant is currently employed; second, a determination must be made as to whether the claimant has a severe impairment; third, the ALJ must determine if the impairment meets or equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1; fourth, the ALJ must determine the claimant's RFC, and must evaluate whether the claimant can perform his past relevant work; and fifth, the ALJ must decide whether the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). At steps one through four, the claimant bears the burden of proof; at step five, the burden shifts to the Commissioner. *Id.*

A district court reviewing an ALJ's decision must affirm if the decision is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more

than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In reviewing an ALJ's decision for substantial evidence, the Court may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).

An ALJ must articulate her analysis by building an accurate and logical bridge from the evidence to her conclusions, so that the Court may afford the claimant meaningful review of the SSA's ultimate findings. *Steele*, 290 F.3d at 941. It is not enough that the record contains evidence to support the ALJ's decision; if the ALJ does not rationally articulate the grounds for that decision, or if the decision is not sufficiently articulated, so as to prevent meaningful review, the Court must remand. *Id.*

Analysis of Mr. Gaspari's Arguments

Mr. Gaspari argues that the ALJ's decision should be reversed or remanded because she failed to evaluate properly the medical source opinions; failed to consider Mr. Gaspari's

obesity; and failed to evaluate properly Mr. Gaspari's credibility. Only one of these arguments is new – the argument relating to obesity; Mr. Gaspari raised the other two the last time he was before the Court, and the Court will, therefore, address those first.

1.    The ALJ's Evaluation of the "Medical Source Opinions"

Mr. Gaspari first argues that the ALJ failed to evaluate properly the medical source opinions. As noted above, Mr. Gaspari raised this same argument last time he was before the Court, with some success. This time, he challenges the ALJ's findings that the opinion of Dr. Jilhewar, a non-examining medical expert, was "the most persuasive" and that the opinions of Dr. Pickering and Dr. Brown, both treating physicians, were entitled to "little weight." *See* Brief in Support, p. 15.

Pursuant to 20 C.F.R. § 404.1527(d)(2), an ALJ must give controlling weight to a treating physician's medical opinion if it is "well-supported by medically acceptable clinical and laboratory diagnostic technique" and is "not inconsistent with the other substantial evidence." *See generally Hofslien v. Barnhart*, 439 F.3d 375 (7th Cir. 2006)(discussing 20 C.F.R. § 404.1527(d)(2) at length). Although an ALJ may afford the opinion of a non-examining physician more weight than that of an examining physician, the ALJ may do so "only for reasons supported by substantial evidence in the record; a contradictory

opinion of a non-examining physician does not, by itself, suffice." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) (citing *Moore v. Barnhart*, 278 F.3d 920, 924 (9th Cir. 2002)).

As an initial matter, Mr. Gaspari argues that the ALJ "skipped over the inquiry of whether the treating source opinions were entitled to controlling weight." Brief in Support, p. 15. That is incorrect. In fact, the ALJ acknowledged that, "under the regulations, a treating source's opinion is often entitled to the most weight, and typically given more weight than a non-examining source's opinion." Record at 457. But she also – rightly – recognized that "every case is evaluated based on its own particular facts" and that other factors, beyond whether the opinion comes from a treater or a non-treater, must be considered, including whether the opinion is supported by objective and other evidence, and whether the source provides a sound explanation for the opinion." Record at 457.

In Mr. Gaspari's case, both Dr. Pickering and Dr. Brown opined that he could not work. The ALJ determined that these opinions were not supported by the objective medical evidence, and their conclusions concerning Mr. Gaspari's limitations – which they thought were severe – were neither explained nor supported by that evidence. The ALJ gave specific examples of findings that were undermined by the evidence – for example, Dr. Pickering's finding that Mr. Gaspari had muscle weakness, which

would severely restrict his ability to work, was undermined by the medical evidence showing that muscle weakness was rarely demonstrated and, even then, only on a minimal basis. Record at 453. Most notably, the ALJ determined that Dr. Pickering's and Dr. Brown's opinions that Mr. Gaspari was unable to work were substantially undermined by the fact that Mr. Gaspari had, in fact, worked.

Moreover, contrary to Mr. Gaspari's suggestion, the ALJ did consider the factors spelled out in the regulations. She specifically addressed the supportability of the treaters' opinions, the explanations (or lack thereof) given by the physicians, the extent to which the opinions were consistent (or not) with the rest of the record, and the physicians' specializations; she also discussed the details of the treatment relationships – the nature and the length of treatment. In short, the ALJ's analysis concerning the weight to be given to the medical opinions of the treaters and non-treaters was reasonable and consistent with the regulations. She thoroughly explained her reasons for giving less weight to the opinions of Dr. Pickering and Dr. Brown and giving more weight to Dr. Jilhewar, and the Court finds her reasoning to be supported in the record.

When the Court considered this argument in the context of the first case, it agreed with Mr. Gaspari because the ALJ had

failed to detail – or even mention – all of the relevant opinions. That is not the case this time. Clearly mindful of this Court's instructions on remand, ALJ Ahmed detailed all of the relevant opinions and explained, with specific references and citations to the record evidence, why she found some more persuasive and others less persuasive. Accordingly, this time the Court rejects Mr. Gaspari's argument and finds no fault with the ALJ's findings concerning the medical source opinions.

    2.   <u>The ALJ's Credibility Determinations</u>

Next, Mr. Gaspari challenges the ALJ's determination that his allegations concerning his inability to do even sedentary work were "not fully credible." Brief in Support, p. 19. In particular, Mr. Gaspari argues that the ALJ should not have held it against him that he was actively looking for work and that he even worked at times during the relevant period. He argues that his "marginal activities of exercising, using a computer and driving to the store a couple of times a week also say little about his capacity to maintain employment on a day-to-day basis." Brief in Support, p. 20.

As the Court noted in its last decision,

> [g]enerally, this Court gives substantial deference to the ALJ's credibility determination, because the ALJ is in the best position to make such a determination. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). However, the Court will review a credibility determination when the ALJ fails to explain why he found the evidence or testimony to be incredible. *Steele*, 290 F.3d at 942.

When evaluating the claimant's credibility, the
ALJ must consider the entire record, and the ALJ's
credibility determination "must contain specific
reasons for the finding on credibility, supported by
the evidence in the case record."  SSR 96-7p, Westlaw,
*1-2; see Clifford v. Apfel, 227. F.3d 863, 872 (7th
Cir. 2000).

Although Mr. Gaspari suggests that the ALJ was dismissive of
his complaints, that is not a fair characterization.  She did not
simply cite his "marginal activities" and move on; rather, she
analyzed in detail his allegations and complaints, and she
provided specific instances where those allegations were
contradicted by the objective medical evidence, by something Mr.
Gaspari said to her, or by something he reported to one of his
doctors.  The ALJ summarized the credibility issues from the
proceedings on Mr. Gaspari's first application, and she added her
own analysis.  She not only rectified the issues flagged by the
Court, but she took great pains to explain in detail the reasons
for her credibility determinations.

When assessing a claimant's credibility, the ALJ may rely on
inconsistencies between the claimant's testimony and the evidence
in the record.  Anderson v. Bowen, 868 F.2d 921, 927 (7th Cir.
1989).  The record here is full of such inconsistencies.  The ALJ
determined that Mr. Gaspari's "statements concerning the
intensity, persistence and limiting effects of his symptoms are
not fully credible as there are many inconsistencies between the
testimony/allegations and other evidence in the overall record."

Record at 442. Indeed, even a dry reading of the hearing transcript reveals some apparent inconsistencies and supports the finding that Mr. Gaspari was less than credible.

For example, the ALJ noted that Mr. Gaspari testified that he had "hypoglycemic attacks" weekly; yet, the progress notes and records from his endocrinologist show that he last reported such attacks at this frequency in 2005; by 2007, there seemed to be no mention of such attacks. Record at 461. He testified that he lost his security guard job because he couldn't handle the walking required; but he also testified that he lost the job when the bank decided to eliminate his position. He told the ALJ that he could not stay on the computer for more than 15 minutes, Record at 1433, yet he told Dr. Liljedahl that he go online and "google things" "for an hour or two." Record at 1352. He testified that he could stand for an hour to an hour and a half, but then said he could not stand long enough to take a shower. Record at 1441-1442.

The ALJ also determined that Mr. Gaspari's activities "do not substantially corroborate his allegation of disabling symptoms." Record at 461. For example, Mr. Gaspari worked through much of the period under consideration, doing jobs that were much more physically and mentally demanding than those contemplated by the ALJ. Mr. Gaspari testified that he could sit for just 15 to 30 minutes because of his back pain, and yet he

sat for almost 2 hours at the hearing. Record at 461. He testified that he worked out at the gym, swam, lifted weights, drove to the store, spent time online, all of which would seem to be at odds with his allegations of disabling pain and fatigue. So too the fact that his course of treatment was not particularly aggressive; when counseled that he could pursue a particular option if what he was using failed to alleviate his symptoms, he declined.

All of these inconsistencies support the ALJ's decision to discount to some extent Mr. Gaspari's credibility. The ALJ adequately explained her reasoning and her reasons are supported in the record. Accordingly, the Court declines to remand on the basis of credibility.

   3.   Mr. Gaspari's Obesity

Finally, Mr. Gaspari argues that the ALJ failed to analyze the impact of his obesity on his RFC. To be sure, Social Security Ruling 02-1p requires adjudicators to specifically consider obesity when making an RFC determination because obesity can increase the claimant's limitations. *See Prochaska v. Barnhart,* 454 F.3d 731, 736-37 (7th Cir. 2006); *Skarbek v. Barnhart,* 390 F.3d 500, 504 (7th Cir. 2004). But the ALJ satisfied this requirement. She recognized that Mr. Gaspari was obese and she included obesity on the list of impairments from which he suffered. And she discussed, in the context of

considering Mr. Gaspari's RFC, the fact that his obesity could aggravate his other impairments – notably, his back and knee pain. She specifically noted that Dr. Jilhewar, the medical expert on whose opinion she primarily relied, noted that "the claimant's obesity, superimposed on chronic back and knee pain . . . would affect prolonged standing and walking as well as lifting." Record at 454. The ALJ also noted Dr. Jilhewar's opinion that, "[g]iven his obesity, back pain and history of knee surgery, he should not kneel, crouch, or crawl. He could occasionally stoop and occasionally climb ramps/stairs." Record at 454. The ALJ found Dr. Jilhewar's opinion to be the "most persuasive" and she based her RFC finding largely on his opinion. Thus, the ALJ's RFC does take into account Mr. Gaspari's obesity and the effects it could have on his ability to stand, walk, lift, kneel, crouch, crawl, stoop and climb ramps and stairs. By specifically noting that Dr. Jilhewar's opinion factored obesity into the mix, and by specifically adopting that opinion, the ALJ implicitly acknowledged that obesity could aggravate Mr. Gaspari's other impairments in the ways noted, which would affect the RFC findings; nothing in his medical records, or in Mr. Gaspari's testimony, suggests that his obesity would aggravate his other impairments or produce limitations beyond those noted by the ALJ.

## CONCLUSION

For the reasons set forth above, the Court rejects Mr. Gaspari's challenges to the ALJ's findings concerning the opinions of his treating doctors, his credibility and his obesity. The Court finds that the ALJ's September 18, 2009 decision is supported by substantial evidence and should be affirmed. Accordingly, the Court denies Mr. Gaspari's Motion for Judgment on the Pleadings [#13] and grants the Commissioner's Motion for Summary Judgment [#16].

Dated: November 23, 2011

E N T E R:

ARLANDER KEYS
United States Magistrate Judge